# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 14, 2010       Decided March 25, 2011
                                    Reissued March 29, 2011

No. 09-5330

PAUL BAME, ET AL.,
APPELLEES

v.

TODD W. DILLARD, IN HIS OFFICIAL CAPACITY (FORMER
UNITED STATES MARSHAL FOR THE DISTRICT OF COLUMBIA),
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:05-cv-01833-RMC)

---

*W. Mark Nebeker*, Assistant U.S. Attorney, argued the cause for appellant. With him on the briefs were *Ronald C. Machen Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

*Lynn E. Cunningham* argued the cause for appellees. With him on the brief was *Zachary Wolfe*.

Before: GINSBURG and ROGERS, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GINSBURG.

Dissenting opinion filed by *Circuit Judge* ROGERS.

GINSBURG, *Circuit Judge*: The named plaintiffs filed this class action suit for damages against Todd Walther Dillard, a former United States Marshal for the Superior Court of the District of Columbia, claiming that, after being arrested during a demonstration in September 2002, they were unconstitutionally strip searched by Deputy U.S. Marshals under Dillard's direction. According to the plaintiffs, caselaw had by then clearly established that the Fourth Amendment to the Constitution of the United States prohibited strip searching a person arrested for a non-violent, non-drug-related misdemeanor absent a particularized reason to suspect the arrestee was concealing contraband or weapons about his person. Dillard moved for summary judgment based upon qualified immunity, and when the district court denied that motion, brought this interlocutory appeal. We conclude it was not clearly established in 2002 that the strip search of a person being introduced into a detention facility violated the Fourth Amendment. Therefore, Dillard is entitled to qualified immunity and to summary judgment.

## I. Background

In 1999 the United States Marshals Service (USMS) adopted Policy Directive No. 99-25 to prescribe, among other things, the procedure for strip searching prisoners and "other persons who are under arrest." The Policy Directive authorized a "strip search," defined as "[a] complete search of a prisoner's attire and a visual inspection of the prisoner's naked body, including body cavities," when "there is reasonable suspicion that the prisoner may be (a) carrying contraband and/or weapons, or (b) considered to be a security,

escape, and/or suicide risk." "Reasonable suspicion" was to be determined according to the following criteria:

    a.  Serious nature of the offense(s) charged, i.e., whether crime of violence or drugs;
    b.  Prisoner's appearance or demeanor;
    c.  Circumstances surrounding the prisoner's arrest or detention; i.e., whether the prisoner has been convicted or is a pretrial detainee;
    d.  Prisoner's criminal history;
    e.  Type and security level of institution in which the prisoner is detained; or
    f.  History of discovery of contraband and/or weapons, either on the prisoner individually or in the institution in which prisoners are detained.

Dillard was the United States Marshal for the Superior Court of the District of Columbia when the plaintiffs were arrested and allegedly strip searched. Under his supervision, all male arrestees held at the Superior Court were strip searched upon arrival, before being put into the cellblock;[*] more specifically, each male arrestee was required to drop his trousers and underwear, bend over or squat, and expose his buttocks and genitals to a male Deputy Marshal. This practice had been instituted in light of an extensive history of prisoners' concealing contraband on their bodies while in the

---

[*] Dillard denies this procedure was "followed in practice," although he concedes for purposes of the appeal that the strip searches occurred in this case. In settlement of *Morgan v. Barry*, Civ. A. No. 81-1419 (D.D.C. 1981), the District of Columbia had signed a Memorandum of Agreement not to strip search female arrestees prior to arraignment without individualized, reasonable suspicion or unless the arrestee was to come into contact with the general inmate population of the detention facility. The practice of strip searching all male arrestees is no longer in place at the Superior Court.

cellblock. In the four years prior to the plaintiffs' arrests, the USMS had documented at least 30 incidents in which Deputy Marshals discovered contraband — including drugs, knives, razor blades, and box cutters — on prisoners brought to the Superior Court cellblock by law enforcement.

Metropolitan Police officers arrested the plaintiffs on the morning of September 27, 2002 while they were protesting a meeting of the International Monetary Fund and the World Bank in downtown Washington, D.C. The officers initially transported the protestors to various police holding facilities; later that day, the officers bused the named plaintiffs and others to the Superior Court and transferred them to the custody of the USMS. Because the plaintiffs had refused to identify themselves to law enforcement authorities, they were recorded as "John Does" on the "lockup list" provided to the Deputy Marshals.

At the Superior Court, each plaintiff first passed through a metal detector and was then subjected to a pat-down search. The Deputy Marshals then strip searched the arrestees in a receiving cell in batches of approximately ten men; no plaintiff was touched and no female was present during the search. No contraband was recovered from any plaintiff.

After being strip searched, groups of 20 to 30 men were placed together in holding cells to await disposition of the charges against them. Each had been charged with either "incommoding" traffic or "failure to obey" a law enforcement officer, both of which are misdemeanors. On September 28 they were released, some having been fined and others not sentenced at all.

The named plaintiffs filed this class action seeking damages from Dillard pursuant to *Bivens v. Six Unknown*

*Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). They claimed the strip searches, because performed without individualized suspicion, violated their right under the Fourth Amendment to be free from unreasonable searches.

The district court certified a class of plaintiffs consisting of:

> All men who were: (1) arrested on September 27, 2002 by the D.C. Police officials during a series of mass protests in downtown Washington, D.C.; (2) remanded by D.C. Police, following their arrests, into the custody of the U.S. Marshal[] for the District of Columbia prior to being released; and (3) subjected by deputy U.S. Marshals to a strip, visual, body cavity search without any particularized or individualized reasonable suspicion that he was concealing drugs, weapons or other contraband. ...

The plaintiffs moved for summary judgment on the issue of liability and Dillard moved for judgment on the pleadings or, in the alternative, for summary judgment, arguing he was entitled to qualified immunity under *Saucier v. Katz*, 533 U.S. 194, 200–02 (2001).

The district court denied Dillard's motion. It concluded the strip searches violated the Fourth Amendment and held Dillard was not entitled to qualified immunity "because the law was clearly established that blanket strip searches of non-violent, non-felony arrestees were unlawful" in 2002. *Bame v. Dillard*, 647 F. Supp. 2d 43, 52, 55 (2009). The court also denied the plaintiffs' motion for summary judgment because Dillard had denied the strip searches occurred, thus creating a genuine issue of material fact. For the purpose of this appeal,

however, Dillard concedes the strip searches took place as alleged.

## II. Analysis

The only issue on appeal is whether Dillard is entitled to qualified immunity, which issue we resolve de novo. *Elder v. Holloway*, 510 U.S. 510, 516 (1994). Qualified immunity is "a defense that shields officials from suit if their conduct 'd[id] not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Ortiz v. Jordan*, 131 S. Ct. 884, 888 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Supreme Court in *Saucier* established a two-step test for determining whether a government official is entitled to qualified immunity. First, the court asks whether "the facts alleged show the officer's conduct violated a constitutional right." 533 U.S. at 201. If so, then the court must determine "whether the right was clearly established" at the time of the alleged violation. *Id.* The Supreme Court has since clarified that "the sequence set forth [in *Saucier*]," although "often appropriate," is not mandatory. *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009). Courts may "exercise their sound discretion" in deciding which question to address first "in light of the circumstances in the particular case at hand." *Id.*

In this case the principle of constitutional avoidance counsels that we turn directly to the second question. As the Court recognized in *Pearson* itself, "There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Id.* This is such a case.

Therefore the first and, as it happens, only question we address is whether it was clearly established in September

2002 that strip searching an arrestee before placing him in a detention facility without individualized, reasonable suspicion was unconstitutional. To answer this question, "we look to cases from the Supreme Court and this court, as well as to cases from other courts exhibiting a consensus view," *Johnson v. District of Columbia*, 528 F.3d 969, 976 (D.C. Cir. 2008) — if there is one. The facts of such cases need not be "'materially similar' ... but have only to show that 'the state of the law [at the time of the incident] gave [the officer] fair warning that [his alleged misconduct] ... was unconstitutional.'" *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Central to our inquiry in this case, as reflected in the briefs of both parties, is the decision in *Bell v. Wolfish*, 441 U.S. 520 (1979). There pretrial detainees and others[*] housed in the New York Metropolitan Correctional Center (MCC), a "short-term custodial facility," challenged the constitutionality of strip searching each inmate who had been visited by an outsider, without regard to individualized suspicion. *Id.* at 523, 558–60. The Court noted that, under the Fourth Amendment generally, the reasonableness of a search is to be determined by balancing "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* at 559.

Applying this general "test of reasonableness," *id.*, the Court in *Bell* upheld the policy of the MCC because the "legitimate security interests of the institution" in preventing

---

[*] The MCC also housed some convicted inmates, "witnesses in protective custody, and persons incarcerated for contempt." *Bell*, 441 U.S. at 524. All were subject to the same policy of strip searching.

the introduction of contraband into the facility outweighed the inmates' interest in privacy: "A detention facility is a unique place fraught with serious security dangers," where the "[s]muggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Id.* at 559–60. Consequently, corrections officials are to be "accorded wide-ranging deference" in adopting policies needed "to maintain institutional security." *Id.* at 547–48. In so stating, the Court expressly rejected the plaintiff inmates' argument that less deference is due to an official holding detainees — as was Dillard in this case — as opposed to convicts. *Id.* at 547 n.29.

Dillard argues *Bell* establishes the strip searches conducted at the Superior Court were not clearly unconstitutional. For their part, the plaintiffs contend there was by 2002 — when the searches here occurred — a consensus among the circuits to have considered the issue that *Bell* required individualized, reasonable suspicion to support the strip search of "persons arrested for non-violent non-drug related misdemeanor offenses."[*]

Dillard responds with the decisions in *Powell v. Barrett*, 541 F.3d 1298 (11th Cir. 2008) (en banc), and *Bull v. City and*

---

[*] The plaintiffs cite *Wilson v. Jones*, 251 F.3d 1340 (11th Cir. 2001), which was overruled by *Powell v. Barrett*, 541 F.3d 1298 (11th Cir. 2008) (en banc); *Roberts v. Rhode Island*, 239 F.3d 107 (1st Cir. 2001); *Masters v. Crouch*, 872 F.2d 1248 (6th Cir. 1989); *Weber v. Dell*, 804 F.2d 796 (2d Cir. 1986); *Jones v. Edwards*, 770 F.2d 739 (8th Cir. 1985); *Stewart v. Lubbock County*, 767 F.2d 153 (5th Cir. 1985); *Giles v. Ackerman*, 746 F.2d 614 (9th Cir. 1984), which was overruled by *Bull v. City and County of San Francisco*, 595 F.3d 964 (9th Cir. 2010) (en banc); *Hill v. Bogans*, 735 F.2d 391 (10th Cir. 1984); *Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir. 1983); and *Logan v. Shealy*, 660 F.2d 1007 (4th Cir. 1981).

*County of San Francisco*, 595 F.3d 964 (9th Cir. 2010) (en banc), which he says created a conflict among the circuits as to the meaning of *Bell*.   In *Powell*, the Eleventh Circuit upheld the "practice of strip searching all arrestees as part of the process of booking them into the general population of a detention facility, even without reasonable suspicion to believe that they may be concealing contraband."  541 F.3d at 1300.   In *Bull*, the Ninth Circuit similarly concluded the policy of the San Francisco Sheriff's Department of strip searching all arrestees upon introduction into the general jail population did not violate the Fourth Amendment, and therefore reversed the district court's denial of the sheriff's motion for summary judgment based upon qualified immunity.  595 F.3d at 966.

The plaintiffs argue we should disregard *Powell* and *Bull* because they were decided after the strip searches at issue here and were therefore unknown to Dillard at the relevant time.   Alternatively, they would have us distinguish these cases because they addressed the rights of persons being booked into a general jail population for "housing them overnight or longer."  The plaintiffs also point to other cases they say gave Dillard "fair warning" that strip searching the plaintiffs was unconstitutional.  These include a March 2002 decision of the District Court observing that "[m]ost federal courts of appeals" had agreed "that strip searches of individuals arrested for minor offenses violate the Fourth Amendment unless the individual is reasonably suspected of concealing weapons, drugs, or other contraband," *Helton v. United States*, 191 F. Supp. 2d 179, 184 (D.D.C. 2002), an unpublished Ninth Circuit decision, *ACT UP!/Portland v. Bagley*, No. 93-35592, 1995 WL 375822, at ∗5 (June 22, 1995), denying qualified immunity to the Deputy Marshals who had strip searched demonstrators who had been arrested,

and the Memorandum of Agreement in *Morgan v. Barry*, Civ. A. No. 81-1419, discussed above at 3 n.∗.

We conclude the law in 2002 did not clearly establish that strip searching all male arrestees prior to placement in holding cells at the Superior Court violated the Fourth Amendment. The governing precedent was then, as it is now, *Bell v. Wolfish*, and nothing in *Bell* requires individualized, reasonable suspicion before strip searching a person entering a detention facility. To the contrary, as the Eleventh Circuit would later point out, "The *Bell* decision means that the Fourth Amendment does not require reasonable suspicion for this type of strip search in detention facilities." *Powell*, 541 F.3d at 1308.

The dissent places great weight upon a passage in *Wilson v. Layne* in which the Supreme Court suggested the plaintiffs there could have prevailed by identifying "a consensus of [lower court] cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." 526 U.S. 603, 617 (1999). We are aware of no Supreme Court case, however, that suggests a reasonable officer could not have believed his actions were lawful despite a consensus among the courts of appeals when a precedent of the Supreme Court supports the lawfulness of his conduct.

A different reading of *Bell* by the several circuits to have considered the issue before 2002 could not "clearly establish" the unconstitutionality of strip searches in this context. That *Powell* and *Bull* came down after 2002 is of no moment; those opinions simply accord with our own understanding that *Bell* did not establish the unconstitutionality of a strip search under

conditions like those present here.* 1 WILLIAM BLACKSTONE, COMMENTARIES *70–71 (If a "judge may mistake the law," then "subsequent judges do not pretend to make a new law, but to vindicate the old one from misrepresentation"). Indeed, the Eleventh Circuit expressly considered and rejected the pre-2002 decisions of the circuits requiring reasonable, individualized suspicion before conducting a strip search at a detention facility, *Powell*, 541 F.3d at 1306–07, and the Ninth Circuit likewise rejected those decisions requiring reasonable, individualized suspicion before strip searching an arrestee entering a general jail population, *Bull*, 595 F.3d at 980–81. In other words, those courts did not believe the prior decisions upon which the plaintiffs rely had established — much less clearly established — that strip searches of the sort here at issue were unconstitutional. Why, then, should Marshal Dillard have believed that?

Clearly, it was reasonable for Dillard, like the courts of appeal that reached the issue after 2002, to believe strip searching all male arrestees was consistent with the law as set forth in *Bell* and as implemented by the USMS in Policy Directive No. 99-25. The correctional center in *Bell*, like the Superior Court cellblock, was used primarily to house not

---

* Since oral argument in this case, the Third Circuit has joined the Eleventh and the Ninth Circuits in upholding the constitutionality of strip searching all arrestees upon their introduction into a general jail population. *Florence v. Bd. of Chosen Freeholders*, 621 F.3d 296 (3d Cir. 2010); *but see Jimenez v. Wood Cnty.*, 621 F.3d 372, 375–76 (5th Cir. 2010) (following circuit precedent in holding reasonable suspicion is required to strip search an individual arrested for a minor offense); *Stearns v. Clarkson*, 615 F.3d 1278, 1282 (10th Cir. 2010) (circuit precedent clearly established "a detainee who is not placed in the general prison population cannot be strip searched" without reasonable suspicion) (internal quotation marks and citation omitted).

convicts but persons awaiting their appearance in court. 441 U.S. at 524. The dissent makes much of the distinction between "pretrial detainees" and "pre-arraigned arrestees" in its attempt to distinguish this case from *Bell*. As the court in *Powell* observed, however, "The policy that the Court categorically upheld in *Bell* applied to all inmates, including those charged with lesser offenses and even those charged with no wrongdoing at all who were being held as witnesses in protective custody." 541 F.3d at 1307. Thus, the purported distinction "finds no basis in the *Bell* decision, in the reasoning of that decision, or in the real world of detention facilities." *Id.* at 1310. Because many arrestees, including "[d]emonstrators or protestors engaged in civil disobedience, ... have all the time they need to plan their arrests and conceal items on their persons," *id.* at 1313–14, we have no reason to believe arrested demonstrators are any less a threat to security than are pretrial detainees.

Furthermore, the Court's rationale in *Bell* applies equally to any detention facility that is "fraught with serious security dangers," *id.* at 559, as was the cellblock at the Superior Court, where often hundreds of arrestees were processed in a single day. Contrary to the plaintiffs' contention, nothing whatsoever in *Bell* suggests its holding is limited to overnight detention facilities. *Cf. Powell*, 541 F.3d at 1310 ("The need for strip searches at *all* detention facilities ... is not exaggerated") (emphasis added). Nor — despite the emphasis our dissenting colleague places upon "intermingling" with other arrestees or detainees — did the Court in *Bell* anywhere mention, let alone rely upon, such intermingling as a reason for upholding the strip searches. In any event, arrestees held at the Superior Court were in fact commingled with other arrestees in holding cells; no one suggests each arrestee was put in a separate cell.

13

Moreover, the Court in *Bell* upheld strip searches even though "there ha[d] been only one instance where an MCC inmate was discovered attempting to smuggle contraband into the institution on his person." 441 U.S. at 559. As the Court speculated, the dearth of incidents may be a "testament to the effectiveness of this search technique as a deterrent." *Id.* Be that as it may, the record here substantiates Dillard's point that the Superior Court had a persistent problem with contraband being smuggled into the cellblock, the very reason for strip searches contemplated in subsection (f) of Policy Directive No. 99-25. Furthermore, the strip searches at the Superior Court were no more intrusive than those upheld as reasonable in *Bell*, where a male was required to "lift his genitals and bend over to spread his buttocks for visual inspection." 441 U.S. at 558 n.39.

Contrary to our dissenting colleague's assertion, decisions of the courts of appeals reached after the events here in suit are relevant to the issue of qualified immunity. In determining whether an official is entitled to qualified immunity, courts focus upon the state of the law "at the time [the] action occurred" because "i[f] the law at that time was not clearly established," then the official "could not reasonably be expected to anticipate subsequent legal developments." *Harlow*, 457 U.S. at 818. The point is not, as the dissent would have it, to deny an official the benefit of subsequent cases reflecting the uncertain state of the law at the time of his action. As the Supreme Court in *Pearson* said of its earlier decision in *Wilson v. Layne*, there "a Circuit split on the relevant issue had developed after the events that gave rise to suit"; the Court nonetheless "concluded that '[i]f judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy.'" *Pearson*, 129 S. Ct. at 823 (quoting 526 U.S. at 618). So, too, here would it be unfair to subject

14

Dillard to money damages for having relied upon the Supreme Court's decision in *Bell*.

## III. Conclusion

Because there was in 2002 no clearly established constitutional prohibition of strip searching arrestees without individualized, reasonable suspicion, we need not consider whether Dillard had individual suspicion as to each of the plaintiffs. The order of the district court is reversed and the case is remanded for that court to enter summary judgment for the defendant.

*So ordered.*

ROGERS, *Circuit Judge*, dissenting:    Contrary to the principles underlying qualified immunity as a limitation on the occasions when liability for unconstitutional conduct by a public official will be excused, the majority holds the conduct is to be evaluated by recently articulated law and not, as the Supreme Court has instructed, by the clearly established law reflected in the consensus of persuasive authority at the time of the conduct.  In so doing, this is the first time a circuit court of appeals has suggested that the protections of the Fourth Amendment to the Constitution against unreasonable searches do not extend to an individual arrested for a non-violent minor offense who is awaiting arraignment apart from the general population of detainees, and is subjected to a strip search in the absence of reasonable suspicion he is hiding contraband or weapons.  This runs contrary to the consensus of ten circuit courts of appeals at the time of the challenged strip searches.  To reach this result the majority tramples over Supreme Court precedent and gives short shrift to the protections of the Fourth Amendment.  Accordingly, I respectfully dissent.

## I.

The former United States Marshal for the District of Columbia appeals on the ground that he is entitled to qualified immunity with respect to the alleged violations of the Fourth Amendment by peaceful protesters who in 2002 were subjected to pre-arraignment strip searches at the D.C. Superior Court cell block.[1]  The plaintiffs came to the Nation's Capital to protest the policies of the International Monetary Fund and the World Bank on the occasion of the institutions' annual meetings on September 27, 2002.  They were arrested for either of two non-violent misdemeanors, "incommoding," D.C. Code § 22-1307,

---

[1]  *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

or failure to obey a police officer, *id.*, § 22-1121. They remained together while in police custody throughout the day, and they were allowed to keep their personal property, such as knapsacks. Upon being turned over to the custody of the U.S. Marshals Service at the D.C. Superior Court, they were patted down and screened by a magnetometer before entering the cell block; no contraband or weapons were found. They then were subjected to drop-squat-and-cough strip searches; no contraband or weapons were found. They were released from custody upon being arraigned by a judicial officer of the Superior Court without being intermingled with other arrestees or committed to a detention facility to await trial. *See Bame, et al. v. Dillard*, 647 F. Supp. 2d 43, 47–48 (D.D.C. 2009).

Two Supreme Court cases elucidate the relevant qualified immunity principles that the majority ignores in relying on developments in the law subsequent to the challenged strip searches. First, in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or Constitutional rights of which a reasonable person would have known." *Id*. at 818. The Court observed:

> Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established *at the time an action occurred*.

*Id*. (emphasis supplied and footnote omitted). The Court emphasized that "[b]y defining the limits of qualified immunity essentially in objective terms, we provide no license to lawless conduct." *Id.* at 819. Thus, "[w]here an official could be expected to know that certain conduct would violate statutory or Constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action." *Id.* at 819.

While emphasizing that "a reasonably competent public official should know the law governing his conduct," *id.* at 819, the Court reserved judgment on the "circumstances under which 'the state of the law' should be 'evaluated by reference to the opinions of this Court, of the Courts of Appeals, or of the local District Court,'" *id*. at 819 n.32 (quoting *Procunier v. Navarette*, 434 U.S. 555, 565 (1978)). In *Wilson v. Layne*, 526 U.S. 603 (1999), the Court resolved this dilemma by concluding that "cases of controlling authority in their jurisdiction" or "a consensus of cases of persuasive authority" could suffice. *Id.* at 617. In *Harlow*, the Court had observed that "an official could not reasonably be expected to anticipate subsequent legal developments." 457 U.S. at 818. Rather, the law at the time of the challenged conduct would be the measure of his eligibility for qualified immunity. *See id.*

Second, in *Safford Unified School District No. 1 v. Redding*, 129 S. Ct. 2633 (2009), the Supreme Court, continuing to focus on the law at the time of the challenged conduct, reiterated that there need not be a prior factually indistinguishable case in order for qualified immunity to be denied: "there is no need that 'the very action in question [have] previously been held unlawful.'" *Id*. at 2643 (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (alteration in original)). Although "[t]he unconstitutionality of outrageous conduct obviously will be unconstitutional," the Court observed that

"even as to action less than an outrage, officials can still be on notice that their conduct violates established law . . . in novel factual circumstances." *Id.* at 2643 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (alteration in original)).

Prior to the events in *Redding*, the issue regarding searches of students had been addressed in only a handful of cases and they went both ways. *Id.* at 2643–44. The Court, therefore, focused on the extent to which the mixed case law suggested that a previous Supreme Court decision, *New Jersey v. T.L.O.*, 469 U.S. 325 (1985), did not definitively resolve the issue. *Id.* The analysis is different in the instant case because in 2002 the law of the circuit courts of appeals was uniform and had been for some time, much as in *Pearson v. Callahan*, 129 S. Ct. 808 (2009). There the Supreme Court concluded that the narcotics task force officers were entitled to rely on the consensus among the courts to the consent-once-removed doctrine at the time of their warrantless entry into a home, despite the lack of a ruling from the officers' own federal circuit, *id.* at 823. Marshal Dillard characterizes the Supreme Court's decision in *Bell v. Wolfish*, 441 U.S. 520 (1979), as permitting visual body-cavity inspections in an institutional setting for security reasons, and thus permitting the challenged strip searches. This characterization, however, fails to take into account the question left open in *Bell*, the evolution of the law addressing that question between 1979 and 2002, or the factual differences between the judicially committed pretrial detainees in *Bell* and the pre-arraignment arrestees in the instant case.

## A.

*Bell v. Wolfish* involved the treatment of pretrial detainees who had been committed to "a federally operated short-term custodial facility in New York City designed primarily to house pretrial detainees" that also housed "some convicted inmates who are awaiting sentencing or transportation to a federal prison

or who are serving generally relatively short sentences." 441 U.S. at 523–24. After "every contact visit with a person from outside the facility," the pretrial detainees were "required to expose their body cavities for visual inspection as a part of a strip search": if male, "he must lift his genitals and bend over to spread his buttocks for visual inspection[,]" if female, "vaginal and anal cavities . . . are visually inspected." *Id.* at 558 & n.39. The district court had ruled that body-cavity searches were permissible only upon a contemporaneous showing of probable cause to believe the inmate is concealing contraband. *See United States ex rel. Wolfish v. Levi*, 439 F. Supp. 114, 148 (S.D.N.Y. 1977). The Supreme Court reversed, holding that, assuming pretrial detainees "retain some Fourth Amendment rights upon commitment to a corrections facility," *Bell v. Wolfish*, 441 U.S. at 558, there are circumstances in which a strip search can be conducted "on less than probable cause," without clarifying what the standard actually is, *id.* at 560. Although stating that "[a]dmittedly, this practice instinctively gives us the most pause," the Court held that "under the circumstances, we do not believe that these searches are unreasonable." *Id.* at 558. The Court noted with regard to the pretrial detainees that "[u]nder the Bail Reform Act, 18 U.S.C. § 3146, a person in the federal system is committed [by a judicial officer after a hearing] to a detention facility only because no other less drastic means can reasonably ensure his presence at trial." *Id.* at 524; *see* 18 U.S.C. § 3142(e). The Court further observed that "[a] detention facility is a unique place fraught with serious security dangers," *Bell*, 441 U.S. at 559, noting that "[s]muggling of money, drugs, weapons, and other contraband is all too common an occurrence," *id.*

In *Bell* the Court stated that the "test of reasonableness under the Fourth Amendment" is "a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Id.* at 559. It reasoned that "maintaining

institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees," and that infringement of constitutional guarantees "must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Id.* at 546–47. Concluding both that "[a] detention facility is a *unique* place fraught with serious security dangers," *id.* at 559 (emphasis added), and that "[t]he searches must be conducted in a reasonable manner," *id.* at 560, the Court emphasized that it was addressing only one question as to the committed pretrial detainees: "whether visual body-cavity inspections as contemplated by the [detention facility's] rules can *ever* be conducted on less than probable cause." *Id.* (emphasis in the original). Upon "[b]alancing the significant and legitimate security interests of the institution against the privacy interests of the inmates," the Court "conclude[d] that they can." *Id.*

The question remaining after *Bell* was whether strip searches of individuals arrested for non-violent minor offenses who are not committed to a detention facility to await trial are reasonable under the Fourth Amendment in the absence of reasonable suspicion the arrestee is hiding contraband or weapons. Lower courts applied *Bell*'s balancing test, noting that the Supreme Court had approved strip searches of pretrial detainees only where objective circumstances indicated they were needed to maintain institutional security, and not as validating a blanket policy of strip searching all pretrial detainees. *See, e.g.*, *Masters v. Crouch*, 872 F.2d 1248, 1253 (6th Cir. 1989); *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272 (7th Cir. 1983). The Fourth Circuit, in holding unconstitutional strip searches of arrestees who would not be intermingled with the general jail population and were accused of crimes not associated with concealing contraband, identified

four factors that weighed against strip searching: (1) the plaintiff would not be intermingled with the general jail population; (2) the offense was not one usually associated with possession of weapons or contraband; (3) there was no cause to believe the particular detainee might possess either; and (4) when the search was conducted the plaintiff had been at the detention center for one and one-half hours "without even a pat-down search." *Logan v. Shealy*, 660 F.2d 1007, 1013 (4th Cir. 1981), *cert. denied sub nom. Clements v. Logan*, 455 U.S. 942 (1982). The following year the Seventh Circuit rejected strip search distinctions between male and female arrestees as a denial of equal protection, stating that the City of Chicago had "failed to show that men and women minor offenders are *not* similarly situated," *Mary Beth G.*, 723 F.2d at 1274 (emphasis in original), and concluding that a strip search of misdemeanor arrestees in City lockups while awaiting arrival of bail money was impermissible absent "a reasonable suspicion by the authorities that either of the twin dangers of concealing weapons or contraband existed," *id.* at 1273. The Ninth and Tenth Circuits adopted a similar approach in balancing the interests identified in *Bell*, and concluded that intermingling with other arrestees or detainees did not necessarily justify strip searches. *See Giles v. Ackerman*, 746 F.2d 614, 618–19 (9th Cir. 1984), *cert. denied*, 471 U.S. 1053 (1985), *overruled on other grounds by*, *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1040 (9th Cir. 1999) (en banc); *Hill v. Bogans*, 735 F.2d 391, 394 (10th Cir. 1984). The Second Circuit in *Weber v. Dell*, 804 F.2d 796 (2d Cir. 1986), adopted an analysis like that of the Fourth Circuit, *id.* at 801–02, and noted the ten like opinions from seven circuit courts of appeals, *id.* at 801, in rejecting as too broad a reading of *Bell* that "suggest[s], much less require[s]" strip searches of all arrested persons held at a jail in the interest of institutional security, *id.* at 801. The Sixth Circuit, in view of its precedent and that of other circuit courts of appeals, concluded, in 1989, that:

it was clearly established in October 1986 that authorities may not strip search persons arrested for traffic violations and nonviolent minor offenses solely because such persons ultimately will intermingle with the general population at a jail when there were no circumstances to support a reasonable belief that the detainee will carry weapons or other contraband into the jail. It is objectively reasonable to conduct a strip search of one charged with a crime of violence before that person comes into contact with other inmates. There is an obvious threat to institutional security.

*Masters*, 872 F.2d at 1255. Thus, prior to 2002 all ten of the circuit courts of appeal to address the open question from *Bell* held that strip searches of arrestees for non-violent minor offenses in the absence of reasonable suspicion were unreasonable under the Fourth Amendment.

## B.

As the district court found, and the majority does not dispute, Maj. Op. at 8 n.*, "[u]ntil 2008, every federal circuit court of appeals to have addressed the issue (ten out of twelve) ruled that, under *Bell*, suspicionless strip searches of pre-trial arrestees charged with non-violent minor offenses was unreasonable and thus unconstitutional." *Bame v. Dillard*, 647 F. Supp. 2d 43, 51 (D.D.C. 2009). The district court cited: *Wilson v. Jones*, 251 F.3d 1340, 1343 (11th Cir. 2001); *Swain v. Spinney*, 117 F.3d 1, 7 (1st Cir. 1997); *Masters*, 872 F.2d at 1250 (6th Cir.); *Weber*, 804 F.2d 796 (2d Cir.); *Stewart v. Lubbock County*, 767 F.2d 153, 156 (5th Cir. 1985); *Jones v. Edwards*, 770 F.2d 739 (8th Cir. 1985) ; *Giles*, 746 F.2d at 616–18 (9th Cir.); *Hill*, 735 F.2d at 394 (10th Cir.); *Mary Beth G.*, 723 F.2d 1263 (7th Cir.); and *Logan*, 660 F.2d at 1013 (4th Cir.). Each of these circuit courts of appeals held either that reasonable suspicion was required regardless of whether the

arrestee was intermingled with other arrestees or that reasonable suspicion was required when the arrestee did not so intermingle. "In other words, at the time of the searches at issue here (September 2002), all these courts, some for nearly twenty-five years, required at least reasonable suspicion to strip search a pre-trial or pre-arraignment arrestee charged with a non-violent, non-drug crime." *Bame*, 647 F. Supp. 2d at 51.

The law in the District of Columbia as of 2002 reflected the consensus of the circuit courts of appeal. In 1982, in a case pending in the U.S. District Court for the District of Columbia involving female protesters, the District government entered into a memorandum of agreement that strip and squat searches of females arrested for non-violent misdemeanors could be conducted only where there is reasonable suspicion the arrestee is carrying a weapon, contraband, or evidence that officers reasonably believe can only be discovered by a strip or squat search or, in some circumstances, when the arrestee is going to be placed in the general inmate population. *Morgan v. District of Columbia*, No. 81-1419 (D.D.C. July 22, 1981); *see Bame*, 647 F. Supp. 2d at 47. Although Marshal Dillard argues that the *Morgan* agreement concerned only female arrestees and did not bind him, the district court noted that it bound the District of Columbia and that Marshal Dillard was familiar with it, *Bame,* 647 F. Supp. 2d at 47 (citing depositions of Marshal Dillard and his Deputy). Marshal Dillard concedes that a case applying the *Morgan* agreement, *Morgan v. Barry*, 596 F. Supp. 897, 899 (D.D.C. 1984), required reasonable individualized suspicion before permitting the challenged strip search procedure.

Additionally, the settlement in *Helton v. United States*, 191 F. Supp. 2d 179, 185 (D.D.C. 2002), put the Marshals Service in the District of Columbia directly on notice six months before the challenged strip searches that they were unconstitutional absent individualized reasonable suspicion. Although *Helton* involved

the Federal Tort Claims Act and District of Columbia tort law rather than the Fourth Amendment, the Constitutional issue was directly implicated because the government argued that plaintiffs (who were anti-fur protesters at a Neiman Marcus department store) were required to prove that the strip and squat search ordered by the U.S. Marshals Service was unconstitutional in order to prevail on their intrusion-upon-seclusion tort claim. The district court ruled that plaintiffs had adequately alleged a Constitutional violation by the U.S. Marshals Service to the extent doing so was required to prevail on the non-constitutional tort claim, noting the "wealth of case law" requiring reasonable suspicion:

> Although almost every federal court of appeals has ruled that strip searches of individuals arrested for nonviolent misdemeanors or other minor offenses violate the Fourth Amendment absent "reasonable suspicion," this Circuit has yet to address the issue. The District Court reached the issue in *Doe v. Berberich*, 704 F. Supp. 269 (D.D.C. 1988). . . . The court's central holding is in line with virtually every other decision on this issue: "[t]here must be reasonable suspicion that the category of offenders subject to strip searches might possess weapons or contraband." *Id.* at 271. The court then held that the strip searches were constitutional even though plaintiffs were charged only with misdemeanors, because the police had complied with governing regulations and had reasonable suspicion to believe plaintiffs were concealing contraband or drugs, given the nature of the offense of possession of a controlled substance. *Id.* at 272.

*Helton*, 191 F. Supp. 2d at 185. In *Doe v. Berberich*, the district court noted precedent rejecting different strip search requirements for female and male arrestees. 704 F. Supp. at 271

(citing *Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir. 1983)).

Reflecting this state of the law, the United States Marshals Service Policy issued in July 1999 instructed that members of the Marshals Service were authorized to conduct strip searches "when there is reasonable suspicion that the prisoner may be (a) carrying contraband and/or weapons, or (b) considered to be a security, escape, and/or suicide risk."[2] USMS Policy 99-25 at 3. The Policy made no distinction between male and female arrestees, and it included a non-exclusive list of six criteria on which to base reasonable suspicion.[3]

_____

[2] Marshal Dillard has not claimed that the plaintiffs presented individualized security, escape, and/or suicide risks.

[3] The Policy listed six non-exclusive criteria, one or more of which may provide the basis for concluding reasonable suspicion exists:

> a. Serious nature of the offense(s) charged, i.e., whether crime of violence or drugs;
> b. Prisoner's appearance or demeanor;
> c. Circumstances surrounding the prisoner's arrest or detention[,] i.e., whether the prisoner has been convicted or is a pretrial detainee;
> d. Prisoner's criminal history;
> e. Type and security level of institution in which the prisoner is detained; or
> f. History and discovery of contraband and/or weapons, either on the prisoner individually or in the institution in which the prisoners are detained.

USMS Policy 99-25 at 3.

12

The district court found that Marshal Dillard and his Deputy "received annual training on the constitutional and legal standards in regard to searches and strip searches," *Bame*, 647 F. Supp. 2d at 47 (citing depositions of Marshal Dillard and his Deputy), in addition to being familiar with then-recent litigation in the District of Columbia challenging strip searches of female protesters, *id*. Further, the district court found that Marshal Dillard did "not seriously contend that no justification was required for the ['Drop, Squat, and Cough' strip] search," but simply "did not develop any justification for strip searching the protester-arrestees, despite the balancing called for in the USMS Policy dating back to 1999." *Bame*, 647 F. Supp. 2d at 51–52; *see id.* at 46.

According to Marshal Dillard, in September 2002 the policy in the District of Columbia was to perform drop-squat-and-cough strip searches of all persons in Marshals Service custody who came into the Superior Court cell block. *See* Dillard Deposition at 23 (May 29, 2008). This policy applied, as the plaintiffs' experiences show, even to those who had been arrested for non-violent minor offenses where extensive pat-downs of clothed arrestees and a magnetometer metal detector revealed no contraband or weapons, and the arrestees were not to be intermingled with other arrestees and had not been arraigned or committed to a detention facility to await trial. The district court ruled that the blanket policy violated the national USMS Policy 99-25 and that in view of the post-*Bell* case law consensus, the blanket policy and the strip searches of the plaintiffs were unreasonable under the Fourth Amendment. *Id.* at 51–52; *see id.* at 47–48.

**II.**

Marshal Dillard's position on appeal, that because *Bell* allowed strip searches in some circumstances and there was no case law to the contrary addressing exactly the same circumstances as in the instant case, the challenged strip searches could not be considered clearly unconstitutional, is without merit as a matter of Supreme Court precedent, Court of Appeals precedent, and local District Court precedent. *See Harlow*, 457 U.S. at 818 n.32; *supra* Part I. Indeed he goes so far as to contend that, contrary to "a consensus of cases of persuasive authority," *Wilson v. Layne*, 526 U.S. at 617, the U.S. Marshals Service was free to conclude that strip searches in the absence of individualized articulable suspicion were constitutional if a District of Columbia appellate court or the Supreme Court had not addressed the issue. *See* Appellant's Br. at 28–29. The majority's analysis is no less troubling inasmuch as it confuses the roles of the court and the public official under qualified immunity analysis. The Supreme Court has repeatedly rejected the notion that a "reasonably competent public official," *Harlow*, 457 U.S. at 819, would not be bound to know the "consensus of persuasive authority" from other circuits much less his own district court by concluding that plaintiffs may bring to the court either "cases of controlling authority in their jurisdiction at the time of the incident which clearly established the rule on which they seek to rely, [ ]or . . . a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful," *Wilson v. Layne,* 526 U.S. at 617; *see Pearson*, 129 S. Ct. at 823.

**A.**

Strip searches, as *Bell* makes clear and the district court acknowledged, must balance strong institutional security concerns of a detention facility and deference to prison officials against the Fourth Amendment's protections. *Bame*, 647 F. Supp. 2d at 52 (citing *Allison v. GEO Group, Inc.*, 611 F. Supp. 2d 433, 462 (E.D. Pa. 2009)); *see Bell*, 441 U.S. at 559, 560.

14

Not once, before or after 2002, has a circuit court of appeals, or the Supreme Court, held that pre-arraignment arrestees for non-violent minor offenses who are held apart from other arrestees and pretrial detainees may be strip searched on less than reasonable suspicion that they are hiding contraband or weapons. More recent cases include *Jimenez v. Wood Cnty*., 621 F.3d 372 (5th Cir. 2010); *Sterns v. Clarkson*, 615 F.3d 1278 (10th Cir 2010); *Archuleta v. Wagner*, 523 F.3d 1278, 1282, 1286 (10th Cir. 2008); and *Campbell v. Miller*, 499 F.3d 711, 718 (7th Cir. 2007). The recent decision of the Third Circuit in *Florence v. Board of Chosen Freeholders of the County of Burlington*, 621 F.3d 296 (3d Cir. 2010) (decided after briefing in the instant case), also does not upset the appellate courts' consensus, for the only question presented was "whether it is constitutional for jails to strip search arrestees upon their admission to the general population," *id*. at 298 . Marshal Dillard's attempt to distinguish the Ninth Circuit's opinion in *Giles*, 746 F.2d at 617 — which held unconstitutional strip searches without reasonable suspicion that an individual arrested for a minor traffic offense possessed a weapon or contraband — as involving a jail that historically had experienced fewer contraband problems than the D.C. Superior Court cell block, ignores that the arrestee in *Giles* was placed in the general jail population, 746 F.2d at 616. And he apparently ignores that the approach adopted by the Supreme Court in *Harlow* and its progeny, focusing on whether at the time of a public official's challenged conduct a "doctrine had gained acceptance in the lower courts," *Pearson*, 129 S. Ct. at 822 (even if his "own Federal Circuit had not yet ruled," *id*. at 823), protects officials who abide by that consensus from incurring liability for their conduct, *see id*. at 823.

Marshal Dillard's reliance on post-2002 decisions is doubly flawed. Under Supreme Court qualified immunity precedent, circuit court of appeals decisions since the strip searches at issue

in 2002 have no bearing on whether he is entitled to qualified immunity on the ground that there was no clearly established law to be followed in 2002. *See Pearson*, 129 S.Ct. at 823; *Wilson v. Layne*, 526 U.S. at 617; *Harlow*, 457 U.S. at 818. But taken on their own merit the post-2002 cases are distinguishable on their facts and do not demonstrate that the law was unsettled in 2002, much less after. The Eleventh Circuit's en banc reconsideration of *Bell* in *Powell v. Barrett*, 541 F.3d 1298 (11th Cir. 2008), involved strip searches of "all arrestees as part of the process of booking them into the general population of a detention facility," *id.* at 1300, and the holding was limited to general population detainees, notwithstanding some of its more sweeping language suggesting broader applicability. *See id.* at 1300, 1314. Similarly, the Ninth Circuit's 2010 en banc reconsideration of *Bell* was explicit in stating that although it was upholding against a Fourth Amendment facial challenge a policy allowing strip searches of all pre-arraignment arrestees introduced into the general jail population for custodial housing, "[w]e do not, however, disturb our prior opinions considering searches of arrestees who were not classified for housing in the general jail or prison population" and that "[t]he strip search policy at issue in this case, and our holding today, applies only to detainees classified to enter the general corrections facility population." *Bull v. City and County of San Francisco*, 595 F.3d 964, 981 & n.17 (9th Cir. 2010). It is clear from this language that the Ninth Circuit sitting en banc in *Bull* took pains not to disturb the well-settled case law requiring reasonable suspicion to strip search arrestees who are not placed in the general jail population. Moreover, distinguishable as these cases are, it bears noting that it required decisions by the en banc courts to revisit *Bell*, suggesting that absent en banc review the issue was clearly established in those circuits

Marshal Dillard's response, relying on *Evans v. Stephens*, 407 F.3d 1272 (11th Cir. 2005), *Savard v. Rhode Island*, 338

F.3d 23, 31–33 (1st Cir. 2003), and *Oxley v. Penobscot County*, 714 F. Supp. 2d 180 (D. Me. 2010), does not advance his cause. In *Evans*, 407 F.3d at 1278–79, the Eleventh Circuit distinguished *Bell* because the strip search was conducted by the arresting officer for the purpose of obtaining evidence, and not in order to prevent contraband from entering the general jail population. And, in any event, the court denied qualified immunity despite the absence of Supreme Court precedent explicitly addressing the standard to be applied. *Id.* at 1279, 1283. In *Savard*, 338 F.3d at 26, 31–33, the First Circuit allowed strip searches of misdemeanor arrestees who had not generally been searched before and were intermingled with violent offenders at the maximum security prison, as distinguished from a local jail or police station, which the court concluded was dispositive. In *Oxley*, 714 F. Supp. 2d at 181 & n.3, the Maine district court did not reach the Constitutional question, instead affirming a magistrate judge's recommendation of qualified immunity for an officer conducting a strip search who incorrectly but reasonably believed there was a valid reasonable articulable suspicion that the plaintiff was carrying contraband, because the plaintiff failed timely to object to the grant of summary judgment. *See also id.* at 184 n.4. Given that the district court's interpretation of *Bell* in *Oxley* is diametrically opposed to that of Marshal Dillard, *id.* at 183–86, it is unclear how he has concluded the case could help his cause.

In sum, Marshal Dillard's reference to a circuit split on certain strip search law questions is unpersuasive for purposes of qualified immunity because there was not a split in 2002. His contention that "[a]lthough only the law that existed before September 2002 can be relied upon to establish its clarity in 2002, the *reasonableness* of [his] conduct is properly analyzed considering the application of cases more recent than 2002," Reply Br. 21, fails for at least two reasons. First, it ignores Supreme Court precedent that, in order to secure Fourth

17

Amendment protections, "a reasonably competent public official" must "know the law governing his conduct" and "that certain conduct would violate statutory or constitutional rights," *Harlow*, 457 U.S. at 819. A decrease in clarity of the law after 2002 would not make a strip search in 2002 more reasonable. Second, none of the cases cited by Marshal Dillard upset the consensus of circuit courts of appeals "that authorities may not strip search persons arrested for . . . nonviolent minor offenses solely because such persons ultimately will intermingle with the general population at a jail when there were no circumstances to support a reasonable belief that the detainee will carry weapons or other contraband into the jail." *Masters*, 872 F.2d at 1255, quoted *supra* page 8. His suggestion that the number of cases discussing strip searches indicates that the law is uncertain also is unpersuasive because the cases reach the same result. Indeed, as a further indication of this stability, most recently (after briefs in this case had been filed) the Tenth Circuit in *Stearns v. Clarkson*, 615 F.3d 1278 (10th Cir. 2010), held that a sergeant was not entitled to qualified immunity for strip searching an arrestee at a county jail without reasonable suspicion where the arrestee was not placed in the general inmate population although the officer who performed the strip search had been told that the arrestee was "'going around following officers, and going to their homes, making threats.'" *Id.* at 1287. The court concluded that the threats did not supply "specific and articulable facts" suggesting a reasonable suspicion that the arrestee was carrying contraband, and the officer's conduct was therefore contrary to clearly established law, including controlling circuit precedent. *Id.*

To the extent Marshal Dillard suggests that the national USMS Policy 99-25 allowed a blanket, non-particularized strip search if an arrestee was entering a facility with a history of smuggled contraband, that Policy itself states that strip searches must be based on reasonable suspicion that a prisoner may be

18

carrying contraband or weapons or may be a security risk, and that one factor to consider is the "[h]istory of discovery of contraband and/or weapons, either on the prisoner individually or in the institution in which prisoners are detained." A blanket policy based solely on the history of contraband discovered at the Superior Court cell block ignores the other factors listed in Policy 99-25, such as the nature of the offense charged, and the balancing that *Bell* contemplates, 441 U.S. at 559, 560. Moreover, to the extent Marshal Dillard suggests post-2002 events are relevant in evaluating the reasonableness of his conduct, a blanket policy is inconsistent with the revised national U.S. Marshals Service policy of April 23, 2003 allowing strip searches only upon an individualized finding of reasonable suspicion and a supervisor's approval.

**B.**

The majority opinion does not address the specific Constitutional right asserted here: the right of an individual arrested for a non-violent minor offense who, unlike in *Bell*, is awaiting arraignment to be free from a strip search absent reasonable suspicion the individual is hiding contraband or weapons. In *Wilson v. Layne*, however, the Supreme Court observed that "[i]t could plausibly be asserted that any violation of the Fourth Amendment is 'clearly established,' since it is clearly established that the protections of the Fourth Amendment apply to the actions of police." 526 U.S. at 615. As a consequence, the Court held that "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). It is reasonable, as the district court found, to expect Marshal Dillard as "a reasonably competent public official," *Harlow*, 457 U.S. at 819, to be aware in 2002 of the distinction between the institutional concerns arising from judicially committed pretrial detainees who have had contact visits with persons outside of a

detention facility, as in *Bell*, and those that arise at a courthouse cell block with regard to pre-arraignment arrestees for non-violent minor offenses who have been subjected to pat-downs and metal magnetometric searches and are not intermingled with other arrestees or pretrial detainees, and consequently have no opportunity to smuggle contraband and weapons to others and thereby threaten institutional security, because the case law consensus made, that distinction.  So does the national U.S. Marshals Service Policy.

Instead, the majority, by eliding this distinction leaves any right so broadly defined that it could plausibly be asserted that no violation of the Fourth Amendment is "clearly established" absent an opinion of the Supreme Court or this court addressing the merits of a Fourth Amendment claim in the particular circumstances at issue.  Absent that, according to the majority, a reasonable public official ignores the consensus of persuasive opinion of the circuit courts of appeals, ignores rulings of the federal district court having jurisdiction over the official's conduct, ignores the policy of his own agency summarizing the current law, and instead hopes that someday a court will conclude the prior consensus misapprehended Constitutional protections.  Whereas the Supreme Court has acknowledged that "an official could not reasonably be expected to anticipate subsequent legal developments," *Harlow*, 457 U.S. at 818, the majority would, in effect, allow a public official to invoke qualified immunity upon stating: "I reasonably anticipated that the courts would revise their opinions."  It matters not, or so it appears if the public official's attempt at clairvoyance is deemed reasonable by a court, whether the official's vatic utterance comes to fruition.  *See* Maj. Op. at 10-12.  Yet the point underscored by *Harlow* and its progeny in adopting an objective standard is to ensure the protection of Constitutional rights by limiting qualified immunity claims to those based on the law as a "reasonably competent public official" would understand it at

the time of his challenged action. Otherwise qualified immunity as the majority defines it leaves the protection of individual Constitutional rights to the subjective interpretation of public officials.

Most notably, in deciding whether for purposes of qualified immunity the law was clearly established in 2002, the majority fails to distinguish, as established by *Harlow* and its progeny, between the role of the court to determine whether the law is "clearly established" at the time of the public official's challenged conduct, and the role of the public official to know and conform his conduct to controlling case law in his jurisdiction, or if none, to the consensus of cases of persuasive authority of which a reasonably competent public official should be aware. In allowing Marshal Dillard to claim qualified immunity based on post-2002 circuit court of appeals decisions, the majority returns to the pre-*Harlow* subjective standard whereby a public official is empowered to read a Supreme Court decision on the Fourth Amendment (*Bell)* as being conclusive on the constitutionality of strip searches of pre-arraignment arrestees such as the plaintiffs despite the clearly established consensus among the other circuit courts of appeals and district court opinions in the official's circuit. As the Supreme Court has adhered to the objective standard adopted in *Harlow*, the public official has no such authority. Although this court has authority to read *Bell* differently than other circuits, Marshal Dillard can point to no case law that would allow him to make that determination, and the majority understandably does not address the cases he cites — *Evans*, *Savard* and *Oxley* — as they offer no support for the view that the consensus was weak or breaking up, *see supra* Part II.A

The majority misses the point in its discussion of how the ten circuit courts of appeals had interpreted *Bell* as of 2002. First, for purpose of claiming qualified immunity the Supreme

Court has already advised public officials of the standard to which they must conform their conduct: clearly established law as evidenced by a consensus of persuasive authority at the time of their conduct. Of course, had the Supreme Court held, or were this court to hold, that the challenged conduct is Constitutionally permissible, which the majority does not hold, then the plaintiffs would have no *Bivens* claim: "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). But the subjective belief of a public official about the law is not the test. *But see* Maj. Op. at 10-12. Second, because *Bell* involved judicially committed pretrial detainees who had contacts with persons outside of the facility while housed in a "unique" detention facility with convicted prisoners, the Court's particular balancing of "the circumstances," *Bell*, 441 U.S. at 558, is of limited relevance. The question left open in *Bell* was answered for Marshal Dillard before September 2002 by a consensus of persuasive authority from the circuit courts of appeals and controlling authority from the federal district court having jurisdiction over his conduct. These courts, upon applying *Bell*'s balancing test, had uniformly held that the Fourth Amendment protects pre-arraignment arrestees who like the plaintiffs were arrested for non-violent minor offenses from strip searches absent reasonable individualized suspicion of hiding contraband or weapons.

Additionally, the majority concludes, erroneously, that the en banc decisions of the Eleventh and Ninth Circuits in *Powell* and *Bull* rejected the prior consensus reading of *Bell* as regards pre-arraignment arrestees such as the plaintiffs and conflates this rejection with a determination that those circuits more recently did not see Fourth Amendment law as clearly established in 2002. The majority then uses this mistaken reading of *Powell* and *Bull* to conclude that Marshal Dillard was likewise

empowered to interpret the law as unsettled in 2002. *See* Maj. Op. at 10-12. The Eleventh and Ninth Circuits have the authority to change clearly established law upon rehearing en banc, but under Supreme Court precedent Marshal Dillard had no such authority to ignore clearly established law. Even if the post-2002 en banc decisions in *Powell* and *Bull* were relevant in determining clearly established law in 2002, which they are not, those holdings are limited to situations in which arrestees are intermingled with the general jail population and present institutional security concerns, and thus are distinguishable from the Constitutional right at issue here.

As troubling as the majority's low opinion is of what "a reasonably competent public official" ought to know of the law under *Harlow* and its progeny, more troubling are the implications of the majority opinion for the protection of Constitutional rights. Applying the analysis established by the Supreme Court for determining when a public official may assert qualified immunity has consequences generally, including for peaceful protesters who come to the Nation's Capital to exercise their First Amendment rights, as well as for any person arrested for non-violent minor offense not usually associated with weapons or contraband. Because Constitutional rights are at risk, the Supreme Court has required that the focus of "a reasonably competent public official" be on the law as it was clearly established at the time of his conduct and not on his subjective hope that the then-settled legal consensus may change. The Supreme Court aimed to protect Constitutional rights by limiting the availability of qualified immunity to those officials who learn the law as it stands before they act and then act in accordance with that law, not those who apply their subjective views instead. Otherwise, although public officials will not obviously be excused from "outrageous conduct obviously . . . unconstitutional," *Redding*, 129 S. Ct. at 2643, they may, the Supreme Court foresaw, be excused from liability

for unconstitutional "action less than outrageous," *id*., as where a court finds "the law" anew prior to the conclusion of a plaintiff's litigation. The majority's approach means there are no objective limits to the scope of qualified immunity because a court may one day hold that the settled consensus of persuasive authority misapprehended a Supreme Court opinion on the requirements of the Constitution. Although the analytical approach that "the law" is there to be found may have jurisprudential validity in some contexts, *see* Maj. Op. at 10-11 (citing 1 WILLIAM BLACKSTONE, COMMENTARIES *70–71), *but see Sosa v. Alvarez-Machain*, 542 U.S. 692, 725 (2004) (acknowledging that "there is a general understanding that the law is not so much found or discovered as it is either made or created") (citing *Black and White Taxicab & Transfer Co. v. Brown and Yellow Taxicab & Transfer Co.*, 276 U.S. 518, 533 (1928) (Holmes, J., dissenting)), it is inapposite under Supreme Court precedent on qualified immunity.

Accordingly, I respectfully dissent.